## National Bank of Shamokin, to use, Appellant, v. Waynesboro Knitting Company.

Argued January 22, 1934. Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*Edmund C. Wingerd,* with him *Charles C. Lark* and *Sharpe & Sharpe,* for appellant.—A corporate note, executed by the proper officers, under the act of 1925,

or by the officer generally authorized to execute such notes, is the note of the corporation: Lycoming Trust Co. v. Allen, 102 Pa. Superior Ct. 184.

The knowledge of a cashier concerning a transaction in which he is personally interested and acted for himself, in detriment to and not for the bank is not imputed to the bank: Gunster v. Scranton, 181 Pa. 327; First Nat. Bank of Bangor v. Trust Co., 297 Pa. 115; Sproul v. Glass Co., 201 Pa. 103; Dominion Trust Co. v. Hildner, 243 Pa. 253; First Nat. Bank v. Trust Co., 251 Pa. 529; United States Nat. Bank v. Evans, 296 Pa. 541; Grange Nat. Bank v. Collman, 103 Pa. Superior Ct. 235.

Accommodation paper of a corporation, regular on its face, and executed by the proper officers, is valid in the hands of a holder in due course.

If one becomes a holder for value of a corporation note, regularly executed, without knowledge that it is accommodation paper, he can recover against the corporation: Cox & Sons v. Brwg. Co., 245 Pa. 418.

Where one of two innocent persons is to suffer from the act of others, the one who gave the others the means of doing wrong must alone bear the consequences of the act: Garrard v. Haddan, 67 Pa. 82; Shattuck v. Cement Co., 205 Pa. 197; Putnam v. Oil Co., 272 Pa. 301.

*Edward M. Biddle, Jr.,* with him *Edwin D. Strite* for appellee.—The knowledge of the cashier of a bank, representing it in a transaction in which he is only indirectly interested is imputed to the bank: Fehr v. Campbell, 288 Pa. 549; Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522; Citizens Nat. Bank v. Speck, 164 Atl. 810; Union Bank & Trust Co. v. Trust Co., 307 Pa. 488.

A corporation may show that a note executed by its president-treasurer was negotiated by him, without authority, and not in the business of the corporation: Putnam v. Oil Co., 272 Pa. 301; Kelley v. Bank & Trust

Co., 299 Pa. 236; Lycoming Trust Co. v. Allen, 102 Pa. Superior Ct., 184.

It is a defense to an action based upon corporate paper that the same is used by an officer of the corporation for unauthorized purposes when the facts are such as to put a reasonable person upon inquiry: Fehr v. Campbell, 288 Pa. 549; Citizens National Bank of Greencastle v. Speck, 108 Super. Ct. 247.

A bank may not retain the benefits of a transaction carried through in its name, by its cashier, and, at the same time, deny his agency for it: Citizens Nat. Bank v. Speck, 108 Pa. Superior Ct., 247; Massey v. Bohn, 4 D. & C. 653.

A bank may not recover from a corporation on a note of the latter, negotiated, without its authority, and as accommodation paper, where the bank's cashier who acted for it, knew the character of the paper and that the person negotiating it had no title to it; and where its proceeds were placed by the cashier to the credit of a stranger to the transaction: Fehr v. Campbell, 288 Pa. 549; Norristown-Penn Trust Co. v. Middleton, 300 Pa. 522; Schmitt v. Title & Trust Co., 61 Superior Ct. 301; Citizens National Bank of Greencastle v. Speck, 108 Superior Ct. 247, 164 Atl. 810.

OPINION BY MR. JUSTICE KEPHART, March 19, 1934:

Graeber was the cashier of the National Bank of Shamokin. He was also a director, large stockholder, and owner of $50,000 bonds of the Republic Radiator Company, a Maryland corporation. John B. Eader, president, treasurer, general manager, director, and owner of approximately one-third of the stock of Waynesboro Knitting Company, was likewise a director, owner of some 5% of the stock, and $50,000 bonds of the Republic Radiator Company. This company, in July, 1929, was in financial difficulty; Graeber and Eader, with two others, Landis and Penney, also heavily

interested, were endeavoring to finance it and avoid its failure.

Sometime before July, 1929, the bank had discounted two notes for $10,000 and $7,500 respectively for the radiator company's benefit, made by Landis and Eader, payable to and endorsed by Penney. Graeber stated to the parties interested that his bank could not rediscount these notes at the Federal Reserve, but they would be able to rediscount corporate obligations. He requested such notes. Thereafter, Eader sent Graeber a note dated July 9, 1929, for $17,500, made by the knitting company payable to "Ourselves" and endorsed by it. The execution and endorsement of the note was as follows: "Waynesboro Knitting Company by J. B. Eader, President and Treasurer." This note was substituted for the $10,000 and $7,500 notes, renewed from time to time, and reduced to $13,500.

In the same month, the same parties agreed to raise $200,000 necessary for the radiator company; of this, Eader, Landis and Penney were to secure $150,000, on which a bonus was to be paid. Graeber refused to endorse any notes but stated that if he had the corporate paper of appellee, he could raise his share ($50,000) by discounting it at appellant bank. A note was executed in the knitting company's name by its president and treasurer for $55,000, and endorsed by Eader, Penney and Landis personally. The $55,000 note represented the $50,000 credit plus a bonus of $5,000 for the bank itself. Furthermore, Graeber secured $60,000 worth of bonds of the Republic Radiator Company to protect the bank's loan. The note was discounted by appellant bank and the proceeds credited to the radiator company, which then sent Graeber a check payable to him individually for $5,000 as a bonus. This check was endorsed and credited to appellant bank. The note was reduced to $54,000 prior to the commencement of this action.

A third note for $6,250 of the radiator company was refused by appellant and returned to the company.

There was substituted for it the knitting company's note which was discounted by the bank. The note was renewed and reduced to $2,500. The note and all renewals were executed and endorsed by appellee "By J. B. Eader, President and Treasurer."

Action was brought on all notes against the knitting company. The court in its charge instructed the jury that the knowledge of Graeber was imputed to appellant bank and, if he knew the notes were accommodation notes of appellee, executed by Eader without authority, and the knitting company received no benefit from them, their verdict should be for the knitting company. The jury so found.

The Act of May 12, 1925, P. L. 615,* relied on by appellant to relieve it of the defense of notice of illegality, was not intended to limit defenses to negotiable instruments issued by a corporation, to forgery, payment or set-off, but provided that the by-laws, as regulations among the stockholders, should have no effect on the execution of contracts with persons having no knowledge of such by-laws. Notes issued by a corporation when signed by the president or vice-president, and secretary or treasurer, shall be considered as being properly executed for and in behalf of the corporation. It

---

* "Section 1. Be it enacted, etc., That the by-laws of any corporation organized or doing business within the Commonwealth shall operate merely as regulations among members or stockholders of the corporation and shall have no effect upon contracts or other dealings with other persons unless such persons shall have actual knowledge of such by-laws.

"Section 2. Any note, mortgage, evidence of indebtedness, contract, or other instrument of writing, or any assignment or endorsement thereof, executed or entered into between any corporation organized or doing business within the Commonwealth and any other person, copartnership, association, or corporation, when signed by the president or vice-president and secretary or treasurer of such corporation, shall be held to have been properly executed for and in behalf of such corporation."

does not follow that though notes are properly executed by and on behalf of the corporation such notes are valid obligations of the company through negotiation and delivery. The act did not validate acts performed beyond the power of the corporation of which the holder had or was affected with knowledge, or acts grounded in fraud; nor under similar circumstance does the act justify an abuse of powers by officers in issuing corporate instruments, as for instance, when they are to be used in payment of a personal debt of the officer or for the benefit of the officer or of a third party without consideration going to the corporation issuing them.

The notes in question were the accommodation notes of a manufacturing company. It is ultra vires for a manufacturing corporation to lend its credit to another by issuing or endorsing bills or notes as an accommodation (Federal Nat. Bank v. Coal Co., 220 Pa. 39). But if a corporation having general power to issue and endorse negotiable paper for its own benefit in the course of business becomes accommodation maker or endorser for another, the corporation will be presumed to have acted within the scope of its powers, and will be liable on the instrument to a holder in due course: Cox & Sons Co. v. North. Brwg. Co., 245 Pa. 418; Putnam v. Ensign Oil Co., 272 Pa. 301. We said in the latter case that even though it is known by the holder in due course that, at the time of taking the instrument, it was accommodation paper, liability followed because *absence of consideration* was no defense to the holder in due course; but, in that case, we did not decide that, where a holder in due course *knew* that the accommodating party had no power to accommodate, this knowledge would not be a bar to recovery. Lack of consideration and complete want of authority to issue or abuse of power in issuing accommodation paper, when known to a holder before he becomes such, is a defense to the enforcement of payment of such notes. Were it otherwise,

ultra vires acts of corporations (and the acts of insane people) would in all such cases be held valid and binding. Where it appears that the title to a note is defective because of the absence of power in the company to execute the instrument or do a thing sought to be enforced, a presumption is raised in the maker's or endorser's favor, and the burden is on the holder to show that he or some one before him was a holder in due course.

When the notes were brought to the bank by the president of (the maker) the knitting company, with the endorsements thereon, and the proceeds of the notes were deposited to the credit of the Republic Radiator Company, the party accommodated, the possession by the maker and its negotiation to the bank indicated prima facie that the note negotiated was accommodation paper: Oppenheim v. Simon Reigel Cigar Co., 90 New York Supp. 355; Rudolph Sav. Bank Co. v. Anchor Oil & Gas Co., 101 Ohio State 217, 128 N. E. 266. It may be this circumstance might be conclusive, but we need not depend on this type of notice since here we have actual notice.

It is admitted that the cashier of a bank who was interested as a stockholder in the accommodated corporation, knew that the knitting company was lending its credit as maker of the accommodation paper to the radiator company. It is also testified that the cashier knew the knitting company could not lend its credit, but his bank was willing to accept it. It is claimed by appellant that as he was engaged in his own business in securing the discount of the $50,000 note, the bank should not be held to have had knowledge of wrongdoing in passing through the institution the accommodation paper of the knitting company, under the authority of Gunster v. Scranton, etc., Co., 181 Pa. 327, followed by a line of cases. The principle there stated is as follows: "The rule that knowledge or notice on the part of the agent is to be treated as notice to the

principal is founded on the duty of the agent to communicate all material information to his principal, and the presumption that he has done so. But legal presumptions ought to be logical inferences from the natural and usual conduct of men under the circumstances. But no agent who is acting in his own antagonistic interest or who is about to commit a fraud by which his principal will be affected does in fact inform the latter, and any conclusion drawn from a presumption that he has done so is contrary to all experience of human nature." This rule has been followed in many cases down to F. N. Bk. of Bangor v. Bangor Trust Co., 297 Pa. 115. It will be noted that the foundation of the rule of imputed knowledge is "antagonistic interest," or the situation where an agent is about to commit a fraud on his principal. If neither of these circumstances exists in that the cashier was acting as the only representative of the bank which was transacting business, and his personal interest was incidental or indirect, the rule does not apply, although his conduct and his judgment may have been influenced by his interest in the corporation which received the funds. It is apparent from the record that the cashier, Graeber, while an interested stockholder in an institution that was in financial distress, was, as well, acting for the interests of the bank: he first demanded a bonus of substantial amount; second, procured the endorsement of three individuals in addition to the accommodation endorsement of the knitting company; third, demanded corporate paper purely in the interest of his bank in order that it might be rediscounted at the Federal Reserve Bank; fourth, took bonds as collateral for the note; fifth, at no time was a party to the transaction except in the capacity of the bank's cashier. It does not appear that when Graeber did all these things he believed them useless or unsafe security or that he felt the bank would lose. Graeber acted for the bank, and

his knowledge of the defect in the notes is properly imputable to his principal, the bank.*

The conclusion is therefore compelled that the bank is not a holder in due course and is subject to the defense of the corporation that the issuance of these notes was ultra vires.

We need not discuss the fact that the bank retained the benefits of the transaction carried on in its name by its cashier, yet here denied his agency. See Cit. Nat. Bk. of Greencastle v. Speck, 108 Pa. Superior Ct. 247. What we have said disposes of the case.

Judgment affirmed.

---

* A line of authorities treat the question as one of direct knowledge rather than of imputed knowledge. These courts have reasoned, as did the court in Cook v. American Tubing and Webbing Co., 28 R. I. 41, 65 Atl. 641: "that a corporation shall be held responsible for the knowledge which is possessed by those whom it appoints to represent it. From the nature of its constitution it can have no other knowledge than that of its officers, and, in dealing with such officers, as with the corporation itself, third parties have a right to consider what they know it knows. Indeed, when the presiding officer of a corporation is intrusted with the transaction of its business, with full power to bind the corporation in respect to such business, it seems more proper to call the knowledge which he has actual knowledge of the corporation rather than to say it is imputed." This case and many others obviously place such a statement upon policy and expediency. Cases following the Cook Case, supra, are: First Nat. Bank v. Leeton & Brother, 131 Miss. 324, 95 So. 445; Atlantic Cotton-Mills v. Indian Orchard Mills, 147 Mass. 268, 17 N. E. 496; First Nat. Bank v. Burns, 88 Ohio 434, 103 N. E. 93; Megunticook Nat. Bank v. Knowlton Bros., 135 Atl. 95 (Me. 1926); Bank of New Milford v. Milford, 36 Conn. 92; Brobston v. Penniman, 97 Ga. 527, 25 S. E. 350; Fouche v. Merchants Nat. Bank, 110 Ga. 827, 36 S. E. 256; First Nat. Bank v. Blake, 60 Fed. 78 (C. C.). See 2 Pomeroy, Equity, section 675 and note, page 1360.